The action is in assumpsit to recover a sum of money left by the plaintiff's intestate at the time of his death, and which, it is alleged, came to the hands of the female defendant, *Page 100 
and which was used by her. The defense was that the money, if used by her, was used in burying the intestate and supporting the family, and that not more was left by him than was necessary for those purposes. His Honor instructed the jury that the defendant, Mrs. Simpson, as the widow of her deceased husband, had a right to use as much of the money on hand as was necessary to pay the funeral expenses, and (127) also as much as was absolutely necessary for the support and maintenance of the family, until her year's provision was assigned her. The case states that, at the time James Brothers, the intestate, died, he left an ample store of necessary provisions.
We do not concur with his Honor in the view he took of the law in this case. The privilege of a widow, upon the death of her husband, intestate, to interfere with the personal property left by him is clearly pointed out by sec. 17, ch. 121, Revised Statutes. By that section it is provided that "she may take into her possession and charge the whole of the personal estate, and to use so much of the stock, crop and provisions, then on hand, as may be absolutely necessary for the support of herself and family, until administration is granted, when her right to the possession of said estate shall cease." It is by virtue of this statute alone that a widow is, in this State, authorized to interfere with the personal property of her deceased husband. It is conceived in a spirit of kindness to her and the family, and frees her from the risk of becoming an executor of her own wrong, which any intermeddling with it would otherwise have made her. By the charter of Henry I., and by Magna Charta, she was entitled to her quarantine, which is the right to remain in the capital mansion house of her husband for forty days, within which time her dower was to be assigned her. Of the personal property no mention is made, nor until the act above recited, originally passed in 1796, was she, in this State, authorized to intermeddle with the personalty. It all belonged to the administrator, when appointed, and his letters related back to the death of the intestate. Until such appointment, any person, as well the widow as others, who intermeddled with the assets, except to take care of them, made himself an executor of his own wrong. The act of 1796 made the possession of the widow a rightful one, and invested her with (128) the power to use a certain portion of the stock, crop, and provisions on hand, for a certain and specified purpose. This right existed until administration granted, and it is made her duty to take out letters at the next term of the County Court succeeding the death. But the act nowhere authorizes *Page 101 
the widow to use the money which is left; as to it she stands as any other person, and if she does use it for any purpose, she is using money that does not belong to her, and must account for it to the administrator. His Honor charged that she had a right to use as much of this money as was necessary to defray the funeral expenses and to purchase such provisions as were absolutely necessary for the support of herself and family until her year's provisions were assigned her. The latter branch was uncalled for. From the case it appears that at the death of Mr. Brothers, the intestate, he left his family amply provided with everything necessary to their comfort. It was not necessary, therefore, for the widow to purchase anything. But the charge was wrong in principle. If there had been a deficiency of crop, stock, and provisions on hand, and the widow had used the money of the estate, she would have done what the law
did not allow. So, also, as to the funeral expenses. The speedy interment of the body was demanded alike by a decent regard to the opinion of the community, the rights of humanity, and the comfort of the family. And upon whom does that duty more appropriately devolve than upon the surviving head of the family? But it is a moral and not a legal duty — one of imperfect obligation. Imperfect, so far that the law cannot compel the surviving wife to perform it — and yet so strong that its neglect would be punished by the universal execration of the community. While, therefore, no voice could be raised to condemn the act of a widow who uses so much of the money of the estate as may be necessary to deposit in its resting place the body of her husband, the law, with a stern adherence to the rights of others, disavows the right to do so. She (129) had no authority to make use of the money of the estate. In doing so she became responsible to the administrator, when appointed, and the most she could claim would be to be considered as an executor in her own wrong, in which capacity her disbursements in discharge of the liabilities of the estate would be allowed her. For, although funeral expenses are not strictly a debt due by the estate, it is a charge upon it, and to be paid as "opus pium et caritatis," before any debt or duty whatever. 3 Coke Institutes, 22; Toller, 191. The instructions given to the jury on both points were erroneous. Mrs. Simpson, as the widow of the intestate, her former husband, had no legal right to use the money belonging to the estate for either of the purposes designated.
The judgment must be reversed, and a venire de novo ordered.